---

**GAUTIER (PARASSET v.).** See Case No. 10,709.

**GAUTIER, The J. H.** See Cases Nos. 6,399 and 7,319.

**GAVIT (KNIGHT v.).** See Case No. 7,884.

**GAWLEY (HARLEY v.).** See Case No. 6,069.

---

## Case No. 5,279.

### In re GAY.

[1 Hask. 108; 2 N. B. R. 358 (Quarto, 114); 1 Am. Law T. Rep. Bankr. 73; 2 Am. Law T. Rep. Bankr. 52.] [1]

District Court, D. Maine. Jan., 1868.

BANKRUPTCY—DISCHARGE—PREFERENCES — INSOLVENCY—BOOKS OF ACCOUNT.

1. To bar a discharge in bankruptcy for having given a preference to a creditor, the bankrupt, when he gave the preference must have either contemplated bankruptcy or insolvency, or in fact have been insolvent and knew it, or had good grounds for believing it, and have acted on such belief.

[Quoted in Re Doyle, Case No. 4,051. Cited in Re Warner, Id. 17,177.]

2. To bar a discharge, the bankrupt must have designedly and intentionally given a preference, but the creditor receiving it need not have known that his debtor was insolvent.

[Approved in Re Louis, Case No. 8,527. Cited in Martin v. Toof, Id. 9,167; Re Hannahs, Id. 6,032.]

3. A trader is insolvent when he cannot pay his debts in the ordinary course as traders usually do.

[Cited in Graham v. Stark, Case No. 5,676; Hardy v. Clark, Id. 6,058; Re Bininger, Id. 1,420; Hurley v. Smith, Id. 6,920; Re Doyle, Id. 4,050; Grover & Baker Sewing Mach. Co. v. Clinton, Id. 5,845.]

4. Proper books of account for a tradesman are such as disclose the real condition of his affairs, and need not be in any particular form.

[Cited in Re Bellis, Case No. 1,275; Re Brockway, Id. 1,917; Re Archenbrown, Id. 505.]

5. The want of such books will prevent a discharge in bankruptcy.

[Cited in Re Howard, 59 Vt. 595, 10 Atl. 716.]

In bankruptcy. Petition by a bankrupt [Benjamin C. Gay] for his discharge. Credit-

---

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission. 2 Am. Law T. Rep. Bankr. 52, contains only a partial report.]

ors objected upon the ground that the bankrupt had given a fraudulent preference, and had not kept proper books of account.

Manasseh Smith, Thomas B. Reed, Josiah H. Drummond, and Woodbury Davis, for petitioner.

Almon A. Strout and George F. Shepley, for objecting creditors.

FOX, District Judge. [The bankrupt having presented his petition for a discharge, seven of his creditors, merchants in this city, having duly proven their claims, appeared on the return day of the petition, and have filed specifications of their objections to his discharge, being sixteen in number. At the hearing, several of these specifications were adjudged defective, not sufficiently exact and precise to require the bankrupt to make defence thereto, and upon others, an opinion was also intimated, that they were not sustained by the testimony. There were others, however, which were fully argued at the bar, and they have since received the careful attention of the court—the examination of the bankrupt and depositions, together with all the other evidence in the case, having been diligently examined by me.][2] It appears from all the evidence that the bankrupt began trading in Casco, in the county of Cumberland, in June 1866, with a small stock, not exceeding $800 in value; that at that time he was in fact insolvent, having some years previously been engaged in business. His property at this time, besides his stock in trade, consisted of fifty-five acres of land called the "Merritt Gay Place," for which he was then considerably in debt, and his homestead of the value of $1,000 or $1,200, of which $500 in value he had in 1865 exempted from liability for his debts by availing himself of the provisions of the laws of Maine exonerating a man's homestead from his debts subsequently contracted; and he had also some lands in Kansas, for which less than $100 was realized by his assignee. From my examination of all his property, I am well satisfied that in June, 1866, he was owing $1,000 at least more than he could have been made to pay, allowing him the benefit of the exemption of his homestead. He admits in his examination that he was then insolvent, but denies that he was aware of his situation. A large part of his indebtment was to the town of Casco for moneys received by him as its collector of taxes for the years 1865 and 1866, more than $1,200 being then due from him on this account. The bankrupt continued on in business until Sept. 15th, 1867, when his goods were attached by some of his creditors. His stock was afterwards sold by the assignee in bankruptcy, and about $1,100 were realized from it. His liabilities to the town of Casco continued to increase, instead of diminishing, after he commenced business in June, 1866,

so that, in the spring of 1867 he was indebted to the town of Casco on this account over $2,100. At first he appears to have purchased goods quite sparingly, but at the time of his failure he was indebted to his Portland creditors for over $6,300. He owed one Nutting $1,000 for borrowed money, as he says, which was secured by a mortgage of his stock, made Aug. 30, 1867; and it appears from his schedule annexed to his petition in bankruptcy, that he owed other parties about fourteen hundred dollars.

The property he then possessed, according to his schedule, consisted of his homestead, valued by him at $1,000, and which was subject to mortgages for $637, and to an exemption to the extent of $500, the lot in Kansas, valued by him at $200, and for which less than $100 was realized, and certain standing timber to be taken off from a part of the "Merritt Gay Farm" before May, 1868, the interest in which he valued at $75. He had also his accounts and notes, nominally amounting to $2,000, and his stock, valued by him at not exceeding $1,700, and which was sold for about $1,100, and a small amount of furniture, stock, and farming tools, not subject to be taken for his debts. Most of this large amount of debts for his stock in trade was contracted by him subsequently to the first of April, 1867, but the larger part in July, August and September.

He states in his examination, "That on the fourth of September, 1867, he had no property in this state not exempt from attachment or not incumbered nearly to its full value, except $75 worth of standing timber and his book accounts." His debts, not secured, then exceeded $7,500; and all the property subject to his control to apply to their discharge was the book accounts, nominally amounting to $2,000, but in reality not available for much more than half that sum. He swears that he did not discover the condition of his affairs until Sept. 14th or 15th, 1867.

On the 30th of August he mortgaged to George Nutting his stock in trade to secure the payment of his note given to Nutting on that day, the consideration of the note, as he said, being $400 lent to him by Nutting July 8th, 1867, $400 more lent to him on Aug. 3d, and $195 lent at date of the mortgage, the balance, $5, being allowed for interest on the several loans.

On the 4th or 5th of September, the bankrupt paid to Wilkinson Edes $541 in discharge of a note signed by the bankrupt and Andrew R. Gay, his brother, as principals, and Lewis Gay, his father, as surety. The note was originally given to Merritt Gay as part consideration for the purchase of the Gay farm, and was to be paid by the bankrupt; a portion of the amount thus paid to Edes was borrowed Sept. 4th of one Ephraim Brown by the bankrupt, viz: $415, which was secured by a mortgage of his homestead to Brown.

On the 6th of Sept. the bankrupt paid one

2 [From 2 N. B. R. 358 (Quarto, 114).]

Charles Jordan the amount of his note given in '62 or '63 for $225 and interest, his payment being made by goods from the store.

These three transactions are charged as fraudulent preferences given by the bankrupt, he then being insolvent, or in contemplation of insolvency or bankruptcy, and are presented in various ways as grounds of opposition to his discharge.

The 29th section of the bankrupt act [of 1867 (14 Stat. 517)] declares that no discharge shall be granted if the bankrupt has given any fraudulent preference contrary to the provisions of that act, "or if he has in contemplation of becoming bankrupt, made any pledge, payment, transfer, assignment, or conveyance of any part of his property, directly or indirectly, absolutely or conditionally for the purpose of preferring any creditor or person having a claim against him, or who is or may be under any liability for him."

By the 35th section, it is enacted "that if any person being insolvent, or in contemplation of insolvency, within four months before the filing of the petition by or against him, with a view to give preference to any creditor or person having a claim against him, or who is under any liability for him, procures any part of his property to be attached, etc., or makes any payment, pledge, assignment, transfer or conveyance of any part of his property, either directly or indirectly, absolutely or conditionally, the person receiving such payment, pledge, &c., having reasonable cause to believe such person is insolvent, and that" the same "is made in fraud of the provisions of this act, the same shall be void."

Taking these two provisions in connection, I hold that in order to deprive a party of his discharge, the transfer or conveyance constituting the preference must be made by him in contemplation of bankruptcy or insolvency, or when he is in fact insolvent; and in the latter case the court must not only be satisfied that he was insolvent, but further, that he either had actual knowledge of his insolvency, or had good grounds for fearing and believing that he was insolvent, and acted on such belief in making the preference. In short, he must have designedly and intentionally given a preference, meaning to secure or pay that particular creditor, when he was not able to pay all his debts in the usual and ordinary course of business at the time, fearing and believing such to be the condition of his affairs. If such is his situation, and he so acts, meaning to secure a favored creditor, whether his other creditors shall get their pay or not, I am of opinion that he is not entitled to his discharge; he has a fraudulent purpose and design to violate the law by giving one of his creditors security, when he believes he cannot do the same by all the others, or discharge his liabilities to them as they accrue. This is directly in opposition to one great and leading purpose of the law, which is to distribute the property of an insolvent man among all his creditors equally and without preference, and it is this fraudulent intent of preference, if carried out by the bankrupt, which the law punishes by depriving him of his discharge. I do not think it is necessary that the creditor, receiving payment or security, should know of the insolvency, in order to defeat the discharge by the preference given to him; but such knowledge is necessary, to enable the assignee to avoid the payment or security. On the part of the creditor there must be a guilty participation in taking the transfer, which the law declares shall consist in the knowledge of the insolvency, and that the preference was given in fraud of the act; unless this is shown, he can retain what he may have received. But whether the creditor is or is not aware of the fraudulent purpose and design of the bankrupt, this fact can in no way affect the condition of the bankrupt himself; he must be held responsible for his own actions, and abide the consequences of his own fraudulent purposes and designs, and should not be permitted to derive any benefit from the fact, that in accomplishing his fraudulent purpose, he was shrewd enough to conceal from the other party his insolvent condition. He should present himself with a clear conscience, and the court should be satisfied that he has been entirely innocent of carrying into execution any intent to violate an act, from which he claims so great a benefit as a discharge from all his debts. If he has given a preference in fraud of the act to one of his creditors, who is so ignorant of his circumstances that the law permits him to retain the profits of the preference, it is certainly as great a fraud on the part of the bankrupt, as if the preference had been given to one well knowing his condition and design. The other creditors suffer more in the former case than in the latter, because, in the former, the preference is valid, whilst in the latter it can be impeached and set aside. To that extent the bankrupt has succeeded in violating the object and purpose of the law; having thus placed his property beyond its reach, it would be most extraordinary for him to be permitted to enjoy the benefit of the act, when he had thus defeated its provisions, and obtained a discharge because he had concealed from his grantee the knowledge of his situation. If under such circumstances he was entitled to his discharge, a bankrupt with ordinary shrewdness might secure or pay all the creditors that he desired to, and leave nothing of his estate to be applied in bankruptcy to the payment of his general creditors. I cannot accede to such a construction of the law; and although it is apparently adopted by some of the text writers in their commentaries on the bankrupt act, I do not find it sustained by any decision of any one of the district courts of the Unit-

ed States, and I shall not be the first to sanction a proceeding, in my view, so directly in conflict with the great object and design of the law.

What then, was the condition of the bankrupt on the 30th day of August, 1867, and how far was he aware of his condition? On an examination of his statement and the depositions, it appears that when he commenced his business in June, 1866, he was indebted to about $1,000 more than he had property which could by law be applied to the payment of his debts, his greatest liability being to the town for the taxes collected by him, amounting at that time to $1,200, and which the next spring, in April or May, had increased to over $2,000, he having used that amount of the town's money for his own purposes, only a small part of which was applied to payment of debts contracted in his trade. The bankrupt states in his examination that, "I paid up my indebtedness to the town in consequence of measures which they took. Received a letter from the town treasurer in June or July, calling my attention to the town taxes, and saying 'if they were not settled immediately, he would issue his warrant against me and my bondsmen,' adding in a postcript, that 'he wrote this by order of the selectmen.' It was necessary I should have the thousand dollars I borrowed of Nutting to pay my state tax and my creditors. I felt when I borrowed it that it was necessary to enable me to keep along in my business. I not only thought so, but knew it was so. When I got the note from the state treasurer, I knew that I must have the money to pay him. I got the note from him in June or July, before I borrowed the money." Upon his own admissions he was thus pressed by both the state and town treasurers for payment of the large amount he was thus delinquent. He says he borrowed of Nutting on the 8th of July $400, and on the 3d of August a like amount for the purpose of paying the state treasurer. About the first of August, he also sold to Mayberry his peddler's cart and contents, receiving in part payment therefor a town note of $468, which he turned over to the town in part satisfaction of his indebtedness, thus, in fact, applying more than $1,200 of his stock in trade to the discharge of an independent liability, in no way connected with his business as a trader.

On the 30th of August he secured by mortgage on his stock in trade the $800 previously borrowed by him of Nutting, and in a very few days after incumbered by a mortgage his homestead, being all his other available property, the money realized therefrom being applied by him to the payment of a note upon which his father and brother were responsible, but which he had agreed with them to pay.

At the time of giving the mortgage to Nutting on his stock, he was indebted to his Portland creditors for his stock in trade to an amount exceeding $6,000, nearly all of which had been contracted within four months, and a large portion of which he was liable to be called upon to pay at any moment. The Nutting mortgage and the mortgage of his homestead swept from his control all of his available means, excepting his book accounts, and from them he must have known he could not realize enough to pay twenty-five per cent. of his other liabilities.

Looking at the short time in which he had contracted this large amount of indebtedness for his stock in trade, and considering that he was also owing more than one thousand dollars besides, five hundred dollars of which had been contracted by him in the years 1861 and 1864, I am forced to the conclusion, that at the time the bankrupt executed the mortgage to Nutting, he must have been quite aware that he was in that situation which the bankrupt act deems insolvency; that being pressed by the treasurer of the town and state to pay the amounts for which his sureties on his official bond would be otherwise accountable, he saw fit to raise all the money he could obtain, apply the most of it to that object, or to the payment of debts to his friends and relatives, giving security therefor on all his available property.

Instead of supposing that he could, by so doing, go on with his business as a trader, he must have had a sufficient knowledge of his general indebtedness to know that the inevitable result of such conduct would be to break up his business, and leave him without any other means to discharge his other debts. Can any man suppose that the bankrupt did not know at the time he gave the mortgage to Nutting, that it would require nearly the whole of the proceeds of his stock in trade to pay the amount of this incumbrance? And must he not have understood that when his creditors were advised of the mortgage, its purpose and object, and that[1] but a small portion if any of the amount received from the mortgage had been applied to the payment of his business liabilities, they would at once cease from further credit, and that his business would necessarily be determined? No reasonable man could have arrived at any other conclusion; and no man, who was not willfully blind to his condition, could be ignorant of his position in such a posture of affairs. I am apprehensive that the bankrupt was well aware of his condition in May or June, and in order to save his bondsmen obtained this large amount of goods on credit, taking good care to protect his friends and bondsmen by payments and securities, before his other creditors should be aware of his situation.

But it is said that the bankrupt swears he was not aware of his condition until the 15th or 16th of September, and that, therefore, he could not have known before that time that he was insolvent. If, in his statement, he means to be understood that he did not know precisely the exact position of his affairs, I am inclined to believe him; but I

cannot believe that he did not, on the 30th of August, know that he was insolvent within the meaning of the bankrupt act.

Insolvency, as used in this act, does not mean an absolute inability to pay one's debts at a future time upon a settlement and winding up of all a trader's concerns; but a trader may be said to be in insolvent circumstances, when he is not in a condition to pay his debts in the ordinary course, as persons carrying on trade usually do. Such is the definition given to insolvency by the court of queen's bench (Bayly v. Schofield, 1 Maule & S. 338), and it was adopted by the supreme court of Massachusetts in Thompson v. Thompson, 4 Cush. 127; and in Lee v. Kilburn, 3 Gray, 600; and affirmed by Cowen, J., in Herrick v. Borst, 4 Hill, 650. In Barnard v. Crosby, 6 Allen, 331, the court says: "The instruction requires the jury to find that Moore & Crosby were unable to pay their notes and meet their business engagements in the ordinary course of business, and such a state of things constitutes insolvency within the statute." In Re Black [Case No. 1,457], Judge Blatchford makes use of substantially this language in defining insolvency under the present bankrupt act, and so does Nelson, J., in Minnesota. in Merchants' Nat. Bank of Hastings v. Truax [Id. 9,451]. Under the former bankrupt law the supreme court of the United States, in Buckingham v. McLean, 13 How. [54 U. S.] 167, defines insolvency as "a simple inability to pay, as debts should become payable, whereby the business would be broken up."

I entertain no doubt that this bankrupt, at the time of his executing the mortgage to Nutting, must have been so far aware of his condition as to know that he could not meet his debts as they would become payable, and that thereby his business would be broken up; that is to say, he must have known he was insolvent. The very fact of giving a mortgage on his stock for nearly its full amount, leaving little or nothing to apply in satisfaction of the large amount he owed the other creditors, especially when but a small part, if any, of the funds realized from the mortgage were applied to payments for the stock, could not but destroy his credit as a trader. The inevitable result must have been to break up his business; no one, knowing of the mortgage, would afterwards trust him for a dollar, and he must be held to have contemplated the necessary and inevitable result of such transaction. I think therefore, the mortgage given to Nutting was a fraudulent preference by the bankrupt, he being actually insolvent, and that it was made by him with knowledge of, and in contemplation of, his insolvency; and for similar reasons, I find the subsequent payments, made to Jordan and to Edes on the note signed by Lewis and Andrew R. Gay, were alike fraudulent on the part of the bankrupt. and prevent his discharge; and I am satisfied that Nutting, at least, was well aware of the con-

dition of the bankrupt at the time when he made the mortgage.

There is another objection presented by the specifications, upon which a few words may not be inappropriate. The 11th specification charges the bankrupt with not having kept proper books of account subsequent to the passage of the bankrupt act, and especially with not keeping a cash book. The 29th section of the bankrupt law declares that a bankrupt shall not be entitled to his discharge, if, "being a merchant, or a tradesman, he has not, subsequently to the passage of this act, kept proper books of account." The object of this provision is quite apparent, and, in my view, is wise and salutary, and will be enforced by me in all cases where the bankrupt has failed to comply with its requirements. The law intends that a merchants' or traders' books and documents should be in such a condition as to show his business situation to his creditors, as well as to himself. By keeping such books in a proper manner, he cannot but be aware of his standing, of his property and effects, and of his liabilities, and whether his business is profitable or otherwise, and whether he ought to avail himself of the bankrupt act, as well for his own protection as for the benefit of his creditors. On the other hand, his books should exhibit to his creditors his position, so that when placed before them for investigation, they may at once ascertain his standing and property, and the result of his business, and whether everything has been fair and honest on his part.

The bankrupt, in the present cause, kept a journal and ledger, in which most of his sales on credit appear, but they do not exhibit, as I understand, his sales when made for cash or barter; nor does there anywhere appear on his book, any entry of cash borrowed, or of sums paid, either for goods or on other accounts. He states, referring to certain pages of the ledger: "These pages do not contain entries of all the goods which I bought during the time specified therein, from June 6th to July 17th, 1867. I did not enter goods bought for cash; they do not contain accounts of all the goods bought on credit, nor of all the goods bought of business houses in Portland on credit. I bought a large amount of goods on credit after the record of the book ends; these goods were not entered on any book. I did not keep a cash book; these books do not show all the goods sold on credit from March 2d, 1867, down to the time of failure; they do not show all that is due me on account in the course of my business; I have no means of telling how much is now due me that is not on these books; they contain pretty much all. there are a few accounts they do not contain. there are some little items that were never entered at all. Lent ten dollars, which I never entered, and some few little things of that sort. I cannot tell all the cash I have received since March, 1867, and my books do not show. Never entered the goods I sold for cash, or for ready pay, or

for produce, except that I sometimes put it down for a day or two on a piece of paper, to see how much I was doing. When I bought goods in the city, I sometimes took bills, and sometimes did not take bills when I bought for cash and knew the price of the goods. My books do not show all my barter trade since March, 1867, they show nearly all. I have no means of stating the exact amount that they do not show."

In Re Solomon [Case No. 13,167], Mr. Justice Grier, commenting on this provision of the act, says: "It is the policy of this clause of the act, that after its passage, every merchant or tradesman should keep such books of account, as, considering the business and condition of the debtor, would enable any competent person to determine from the books the real condition of the debtor's affairs. It is not necessary that these books of account should be kept according to the forms taught in the schools, or in ledger and day-book, bound in leather. Could any competent person, from the bank books, checks, and other papers kept, without any cash account of receipts and expenditures, determine the real condition of the debtor's affairs? It seems to me the question should be answered in the negative." Tested by this rule, I think it would be extremely difficult for the most competent person to investigate, and ascertain accurately the bankrupt's condition from his books and papers, it appearing that he did not always take bills of his purchases, and that such purchases are not entered on his books, he not keeping "cash accounts of receipts and expenditures."

A cash account, it will be observed, is considered by Judge Grier as of great importance, and with this opinion of the learned judge, I fully concur. I fear that it is a custom not as common with merchants and traders as it should be. There is no account which can be kept, which will be as useful to the honest merchant and trader, as one exhibiting from day to day, his cash receipts and disbursements, the same being at least every week adjusted and settled, and if he should prove unfortunate, it will be the surest protection against any charges of fraud on the part of his creditors; it will always be in readiness for him to appeal to when adjusting accounts with others, if questions should arise as to their correctness, and if called upon to disclose his business affairs before a court of bankruptcy, and to account for the estate and property which he may have had, the cash-book of the honest bankrupt will bear the severest scrutiny, will afford the court the greatest assistance in its investigations, and will be the strongest and most satisfactory evidence which can be produced by the bankrupt in his behalf; whilst, on the contrary, if none such has been kept, the fact must always be looked upon by the court with suspicion, and its absence will deprive the court of the aid and assistance which might otherwise have been obtained from its investigations and disclosures, and the court, for want of this information, may be compelled to refuse the bankrupt a discharge from his debts, which he might have received, if a proper cash-book had been kept by him and produced.

Finding, as I have been compelled to do, that the bankrupt has been guilty of a fraudulent preference to some of his creditors, when he was within the meaning of the bankrupt act insolvent, I must refuse him his discharge. I trust that this may prove a salutary warning and lesson to all other merchants and traders in this state, who may hereafter find themselves in a condition in which they are unable to pay their debts, as they shall become payable, and thereby their business be broken up. In such a situation they are insolvent, and it is seldom that a man is not aware of such a condition of his affairs, and a court is not much inclined to listen to his assertion, that he was not aware of it. Instead of attempting to pay or secure any of their creditors, such persons should at once avail themselves of the benefit of the bankrupt law, affording to each of their creditors a just and equal portion of their estate, and any preferences given by them under such circumstances will subject them to the provisions of the act, which authorize their creditors to force them into bankruptcy, under the section providing for involuntary bankruptcy. In such a case, the same as upon their own voluntary petition, they will not be enabled to obtain their discharge, if opposed by their creditors, and the party receiving the fraudulent preference may be compelled to refund the entire amount he has received in violation of the act.

The only prudent course for one, who may be so unfortunate as to find himself in insolvent circumstances, is for him immediately to appeal to the law for its aid and relief, and if his business has been fairly and honestly conducted, he will certainly find his appeal has not been in vain, but, on the surrender of all his estate, he will again become a free man, discharged from the burden of his indebtedness, and at liberty to commence anew, and be protected in the enjoyment and possession of the fruits of his own labor and industry for the future. Discharge denied.